**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.  1:23 cr-10074-FTS |
| | ) | |
| JEAN MOROSE VILIENA | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**
**AND MOTION FOR UPWARD DEPARTURE AND VARIANCE**

The United States, through undersigned counsel, respectfully submits this sentencing

memorandum and motion for upward departure, and in the alternative, a variance.  The

government respectfully asks the Court to sentence the defendant to 120 months of

imprisonment, a term of incarceration commensurate with the severity of his misconduct.  Such a

sentence not only reflects the gravity of the defendant's crimes but will also provide justice to the

survivors and families of the victims who continue to suffer the effects of the defendant's

persecution and concealment.

In their victim impact statements, attached hereto as Exhibits A-E, the victims and

witnesses have recounted the loss of their families and life as they once knew it in Haiti. While

his victims were suffering, the defendant enjoyed everything America has to offer: a job;

sufficient income; a comfortable home; a safe community; a green card affording him the ability

to visit his family in Les Irois at any time; and, most importantly, the privilege of raising and

educating a son who is now a U.S. citizen by birth.  Any sentence imposed in this case must

account for the profound disparity in the life the defendant has lived through his criminal

conduct and the lives taken and those lived by the victims and witnesses who were persecuted

and then denied justice because of defendant's concealment. Also, attached hereto, as Exhibit F,

is a brief video of Nissage Martyr before he died which the government will seek permission to play at sentencing.

The government is not requesting that the Court sentence defendant solely for the crimes he committed while Mayor in Les Irois in 2007 and 2008.  If it were making such a request, the government would recommend a sentence in excess of 20 years' incarceration, consistent with the sentencing guidelines applicable to aiding and abetting murder and torture.  *See, e.g.*, USSG §§2A1.5(c)(1) and 2X2.1.  The government is asking the Court to sentence defendant for the crimes of conviction:  the most serious violations of immigration fraud possible, compounded by defendant's total denial of responsibility and his attempts to obstruct justice before this Court. The defendant's deceit throughout the American immigration process impaired the integrity of the critical process used by authorities to determine eligibility for entry into this country. As a result, the defendant was able to walk safely and freely in the United States for over a decade while victims of his brutality were forced into hiding in Haiti. Others have had to seek refuge in the United States out of fear of retaliation by defendant and his supporters.

Defendant's sentence in this case must reflect the gravity of the offenses he assisted in or himself committed in Les Irois beginning in 2007, which his lies concealed.  Prior cases applying the applicable sentencing principles make clear that sentences for immigration offenses committed to conceal serious human rights offenses should be based, in large part, on the nature and extent of those uncharged crimes.  *See, e.g.*, USSG § 2L2.2(b)(4)(B); *see also United States v. Munyenyezi,* 781 F.3d 532, 544 (1st Cir. 2015) (affirming sentencing judge's consideration of the facts underlying defendant's immigration lies).

As outlined below, many courts have imposed statutory maximum penalties for immigration crimes in such cases, concluding that Congress could not have envisioned

defendants more deserving of a maximum penalty than a human rights violator who seeks safe haven in the United States by lying on immigration forms. *Id*.; *United States v. Jabateh*, 974 F.3d 281, 304 (3d Cir. 2020); *United States v. Worku*, 800 F.3d 1195, 1208 (10th Cir. 2015). Even in cases where a defendant has pled guilty, courts have imposed the statutory maximum on murderers who lie about their conduct in order to immigrate to the United States. *See United States v. Jordan*, No. 10-800690-CR (S.D. Fl. Sept. 16, 2020) (sentencing defendant to 120 months for concealing his past as a Guatemalan soldier where he murdered men, women, and children).

In this case, the longest statutory maximum for any one count is 120 months. Collectively, the defendant faces a statutory maximum sentence of 30 years. A sentence below but near the statutory maximum for the most serious count is necessary based on the totality of the circumstances, as analyzed below. The government respectfully submits that the 120-month sentence recommended is a just sentence and is not greater than necessary to achieve the fundamental purposes of sentencing as articulated in 18 U.S.C. § 3553(a).

## I.    FACTUAL BACKGROUND

From presiding at this trial, the Court is well-versed in the facts of this case, and thus only a brief recitation of the evidence is provided in support of the government's sentencing recommendation. In December 2006, the defendant was elected to a four-year term as Mayor of Les Irois as a candidate for the Haitian Democratic and Reform Movement ("MODEREH") political party. The defendant held that position until approximately February 2010. As a candidate and as a mayor, the defendant was backed by Korega, a political machine which exerts power throughout the southwestern region of Haiti through armed violence. Under the defendant's direct supervision, the Korega militia enforced the defendant's policies by various

means, including by targeting political opponents through armed violence. During that time, the defendant engaged in several acts of violence, including the killing of one individual and the attack on a radio station and beatings of two other individuals, which caused these individuals grave injury.

David Boniface ("Boniface") testified at trial. In Haiti, Boniface was a teacher and had trained to become a human rights activist. In or around July 27, 2007, Boniface spoke at a judicial proceeding in Les Irois on behalf of a neighbor who had been assaulted that morning by the defendant. In reprisal for that testimony, the defendant led an armed group to his home, where he and his associates shot and killed David Boniface's younger brother, and then smashed his skull with a large rock before a crowd of bystanders.

In or around March 2008, a group of local journalists and activists founded a community radio station. Defendant opposed establishment of the radio station and, on April 8, 2008, mobilized his supporters, providing them with guns, to forcibly shut down the radio station and seize its broadcasting equipment. Nissage Martyr ("Martyr") was a citizen of Haiti who rented out part of his home to the radio station. On the day of the attack on the radio station, defendant led a group of his supporters into the radio station. When Martyr tried to flee, defendant ordered one of his associates to shoot and kill him. Shots were fired which hit Martyr in the leg. Martyr spent several months in various hospitals and his leg was later amputated above his knee.[1]

Juders Yseme ("Yseme") is a citizen of Haiti who was an 18-year-old student when he became a target of the defendant because of his association with the radio station. On the day of the attack on the radio station, Yseme was at the radio station. Defendant grabbed Yseme and

---

[1] Martyr died under mysterious circumstances the day after the filing of the civil case against the defendant in the United States.

started to punch him.  When Yseme tried to flee, he was hit by a bullet in the face.  Yseme required months of intensive medical treatment, including two surgeries to extract shotgun pellets from his face, which left him permanently blind in one eye.  Pieces of shotgun pellets remain in Yseme's scalp and arms.

Less than two months after the radio station attack, on June 3, 2008, the defendant presented himself at the United States Embassy Consular Office in Port au Prince, Haiti where he submitted an Application for Immigrant Visa and Alien Registration, Form DS-230, Part II in order to gain entry to the United States.  The form specifically requires that each applicant state whether or not they are a member of any class of individuals that are excluded from admission into the United States, including those who have "ordered, carried out or materially assisted in extrajudicial and political killings and other acts of violence against the Haitian people." The defendant responded that he did not belong to this class.  The defendant thereafter swore to, or affirmed, before a U.S. Consular Officer that the contents of the application were true and signed the application.  His answer to that application question was false as evidenced by the testimony at trial from several victims and witnesses to the murder and beatings described above.

On or about June 4, 2008, and based upon the defendant's false representations in the Application for Immigrant Visa and Alien Registration Form DS-230, the U.S. Department of State approved the defendant's DS-230 application.

On or about July 14, 2008—as the result of the approval of his DS-230 application—the defendant gained entry into the United States and was thereafter granted lawful permanent resident status in the United States.  As a further result of the approval of his DS-230 application, the defendant received a Permanent Resident Card.  Prior to his arrest in this case, the defendant

continued to possess a Permanent Resident Card and used such card on numerous occasions to enter the United States.

On March 22, 2017, a civil lawsuit was filed against the defendant alleging various violations under the Torture Victim Protection Act and Alien Tort Statute. *See* Civil Case Number 17-10477-ADB. The facts in that civil action include the incidents described at trial involving Ecclesiaste Boniface, Juders Yseme, and Nissage Martyr. On March 21, 2023, a jury found the defendant liable for the extrajudicial killing of Ecclesiaste Boniface, and the attempted extrajudicial killing and torture of Juders Yseme and Nissage Martyr. Plaintiffs were awarded 11 million dollars in punitive damages.

This Court presided over the criminal trial in this matter. The jury returned a guilty verdict on all three counts of the Indictment on March 28, 2025.

## II.     SENTENCING GUIDELINES CALCULATION

The base offense level for a violation of 18 U.S.C. § 1546 is 8. USSG § 2L2.2. In 2012, the U.S. Sentencing Commission amended the Sentencing Guidelines to add USSG § 2L2.2(b)(4). Because defendant committed his immigration fraud in 2008, the 2012 amendment does not apply. *See* U.S. Const. art. I, § 10, cl. 1; U.S.S.G. § 1B1.11. However, the Court may nonetheless consider "subsequent amendments . . . as tools in making a well-reasoned, individualized determination of whether to impose an upward departure in a particular case or to determine the degree of departure that is warranted." *United States v. Larkin*, 629 F.3d 177, 194 (3d Cir. 2010). The Court should do so in this case. Indeed, Probation used § 2L2.2(b)(4)(B) in calculating the Guidelines and defendant did not object.

The 2012 amendment applies where a defendant conceals his participation in even one "serious human rights offense." *Id.* at § 2L2.2(b)(4)(B). This amendment applies when the

underlying crimes consist of "genocide, torture, war crimes, and the use or recruitment of child soldiers." *Id.* at n.4. The enactment of this enhancement by the Sentencing Commission made plain its determination that procuring immigration benefits by lying about past human rights abuses merits a significant sentence well above the typical 0–6-month Guidelines range for immigration fraud. In this case, defendant concealed his involvement in human rights offenses not covered by this amendment, but his conduct was on par with these crimes and in some respects, even worse. Accordingly, the upward adjustment in § 2L2.2(b)(4)(B)(ii) should partially inform the Court's sentencing determination. If the current Guidelines were to formally apply, they instruct that the greater of two increases determines the offense level. *Id.* at (b)(4)(B)(ii). The offense level would thereby increase by 10 levels to 18, and since the resulting offense level is less than 25, the offense level would increase automatically to 25. USSG § 2L2.2(b)(4)(B). But the analysis should not stop there.

Because defendant willfully obstructed and attempted to obstruct the administration of justice during his trial, the offense level increases by another 2 points. USSG § 3C1.1. Applying the Guidelines at the time of defendant's lie in 2008, defendant's total offense level is therefore 10. However, the government submits that, even beyond the 2012 amendment's enhancement, which would increase the total offense level to 27 if it applied, the defendant's offenses are so serious that they fall far outside the heartland of both the applicable Guidelines for 2008 conduct and the 2012 amendment. Accordingly, the Court should consider the severity of defendant's conduct and impose a sentence of 120 months.

The defendant did not object to an increased offense level under § 2L2.2(b)(4)(B) but argues that he should receive the two-point reduction for his lack of criminal history, resulting in a total offense level of 23.

**A.  Relevant Conduct: the Court should consider the additional evidence of Defendant's other acts of violence in Les Irois.**

In the instant case, defendant's participation in "serious human rights offenses" in Les Irois is relevant conduct that should be considered in determining an appropriate sentence. *See* USSG §§ 1B1.3(a)(1) (acts and omissions of the defendant, and jointly undertaken activity), (a)(2) (same course of conduct or common scheme or plan), and (a)(3) (harms arising from conduct in (a)(1)).  The PSR includes summaries of not only the acts of violence charged in the Indictment but a sampling of additional acts of violence committed by defendant and his associates.  These acts of violence are outlined in PSR ¶¶ 41-43. [2]  They include defendant's associates going to the home of Dotson Lebon,[3] tying him up, and biting and cutting his ears . They also include defendant's associates setting fire to more than thirty houses all belonging to people who opposed defendant's rule.

This additional evidence is directly relevant to sentencing defendant; it is a relevant, continuing course of conduct underlying defendant's false statement that he never materially assisted or otherwise engaged in acts of violence against the Haitian people.  Moreover, it is directly relevant to the nature and extent of defendant's underlying conduct in Haiti—facts that courts repeatedly look to when sentencing human rights violators for immigration fraud.  Since this additional evidence is directly relevant to the conduct underlying those convictions and directly relevant to the policy considerations underlying USSG § 2L2.2, the Court should consider it as a basis for an upward departure.

---

[2] The government will provide the various reports of those incidents to the Court if this is a disputed issue at sentencing.

[3] Dotson Lebon was the uncle of Rodane Marc Lebon, who testified at trial.

Moreover, while defendant was purportedly acquitted in Haiti of conduct relating to the murder of Ecclesiaste Boniface and attempted murders of Juders Yseme and Nissage Martyr, this acquittal was the product of a flawed judicial process. A quick review of the transcript of this so-called "trial" demonstrates that it was an utter sham. Not a single question was asked of the defendant about the murder of Ecclesiaste Boniface or radio station attack. Nor were the victims or witnesses provided an opportunity to be heard, nor was any notice given that a trial was scheduled to take place. Attached as Exhibit G is the actual trial transcript and judgment of acquittal.

### B. The defendant should not be the beneficiary of a Zero-Point Offender reduction.

Defendant should not receive an adjustment as a Zero-Point Offender under USSG § 4C1.1. The nature and circumstances of the defendant's offenses are such that he should not benefit from a guideline designed to provide credit to first-time, non-violent offenders. As a threshold matter, the defendant has escaped prosecution in Haiti for the crimes he committed in Les Irois. As a result, his current criminal history score of 0 already substantially underrepresents the seriousness of his criminal history. Moreover, the Zero-Point Offender guideline excludes defendants who have engaged in certain types of crimes similar to the underlying conduct in which the defendant engaged. *See, e.g.*, USSG §§ 4C1.1 (a)(3) (use of violence or credible threats of violence); (a)(4) (crimes resulting in death or serious bodily injury); (a)(7) (possession or use of a firearm); (a)(8) (crimes motivated by ethnic hate); and (a)(9) (serious human rights offense); (a)(10) (aggravating role in the offense)[4].

---

[4] Defendant was clearly a leader and organizer of the acts of violence that he lied about on his visa application.

Given that the entire purpose of the defendant's scheme to conceal was to prevent authorities from detecting the types of violent crimes which would preclude the application of a Zero-Point Offender reduction, an upward departure, which treats this defendant like other violent criminals is warranted. *See* USSG § 4C1.1, comment n.2. The Application Notes instruct that an upward departure may be warranted if "an adjustment under this guideline substantially underrepresents the seriousness of the defendant's criminal history." As an example, the Note indicates that such a departure may be appropriate if the defendant has a prior conviction or "other comparable judicial disposition for an offense that involved violence or credible threats of violence." Here, there are judicial dispositions for both. Beyond the counts of conviction in this case, defendant has the prior civil verdict against him for extrajudicial killing of one individual, and the attempted extrajudicial killing and torture of another two individuals. The plaintiffs were awarded 11 million dollars in punitive damages to account for defendant's violent conduct. And in the course of that trial, defendant racked up four protective orders against himself because Judge Burroughs repeatedly had to warn him to stop threatening—directly or through others—victims, witnesses, and their families. Notably, these kinds of threats continued during the instant case against the families of witnesses testifying in the criminal trial.

### C. Defendant should receive an upward adjustment for obstruction of justice at trial.

Because defendant willfully obstructed and attempted to obstruct the administration of justice during his trial, the offense level increases by 2. USSG § 3C1.1. Defendant qualifies for this adjustment because he perjured himself and suborned the perjury of multiple witnesses. This is exactly the conduct to which this adjustment applies. *See* USSG § 3C1.1 n.4(B) (listing perjury and suborning perjury as covered obstructive conduct). Granted, the guideline cautions that "the court should be cognizant that inaccurate testimony or statements sometimes may result

from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  U.S.S.G. § 3C1.1 n.2.  Here, however, there was no confusion, mistake, or misremembering.  In fact, defendant testified that if he had to fill out the visa form again tomorrow, he would fill it out exactly the same way.  The defendant's complete denial about having participated in any acts of violence was a continuation of his 2008 lie when he denied such conduct on his visa application.

The Court will recall that defendant took the witness stand and falsely denied that he had engaged in any acts of violence, falsely denied being present at or even aware of the circumstances under which either Ecclesiaste Boniface was murdered or the attempted murders of Juders Yseme and Nissage Martyr, falsely denied having seen the events, falsely denied being associated with the armed group Korega, falsely denied having killed or participated in the killing of Ecclesiaste Boniface, falsely claimed that he had tried to help Nissage Martyr after he was shot and falsely claimed that he himself had been threatened by the victims and witnesses who testified against him.

Moreover, defendant offered perjured testimony from multiple witnesses who denied defendant's participation in any acts of violence against the Haitian people and who told conflicting stories about significant details. Moreover, these witnesses—all fierce supporters of the defendant and some themselves members of Korega, flew from Haiti (apparently under the mistaken belief that they would be able to remain in the United States as evidenced by the escape of one of the witnesses prior to her flight back to Haiti) for the purpose of offering false testimony claiming that the victims and witnesses were members of a group called "The 5,000

Men," which was purportedly engaged in all sorts of violent activity.[5]  None of these allegations were ever corroborated or proven to be true.  This completely incredible testimony was likely discounted by the jury who rendered its verdict in under two hours.

Much like defendant lied to immigration officials on his visa application, defendant also lied to this Court and a United States jury and suborned perjury of his witnesses.  Thus, decades after he was able to subvert the Haitian legal process and lie on his visa application to gain entry to the United States, he made yet another attempt to subvert justice—this time in an American courtroom.  Defendant's deceitful conduct before this Court demonstrates that he continues to place his own self-interest above the law.  He will lie when it suits him.  The jury's verdict in this case has fortunately put an end to his unlawful and oppressive reign.  All that is left now is for the Court to render a just punishment.

III.    MOTION FOR UPWARD DEPARTURE AND VARIANCE

The government respectfully moves for an upward departure pursuant to USSG §§ 5K2.0(a)(2) & (3), and § 5K2.1 as well as a variance under the 18 U.S.C. § 3553(a) factors. With the inclusion of the enhancements outlined above, and the elimination of the Zero-Point Offender credit, the defendant's total offense level would be 27 with a resulting Guideline sentencing range of 70-87 months.  Applying the Guidelines as they existed at the time of defendant's lie results in a total offense level of 10 with a resulting sentencing range of 6-12

---

[5] Both prior to and during trial, the government filed several motions objecting to the purported testimony of defendant's witnesses. Based on the defendant's own proffered interview reports, these witnesses appeared to have no relevant or admissible testimony to offer. Defense counsel presumably realized this was the case and two of the seven witnesses brought from Haiti to the United States to testify never actually testified. Those that did testify either had no relevant testimony or lied, but not before trying to dirty up the government's witnesses with outrageous and unsupported claims, many of which were excluded after the government objected on numerous grounds.

months.  For the reasons set forth below, a Guideline sentencing range of 70-87, let alone 6-12 months, does not adequately account for the kind or degree of circumstances present in the current case, nor does it account for the murder of Ecclesiaste Boniface, attempted murders of Juders Yseme and Nissage Martyr, and other harms inflicted on the citizens of Les Irois.  A sentence of 120 months is consistent with sentences imposed in similar cases and is necessary to deter both this defendant from future retributive action, and other criminals who are inclined to defraud the immigration system in similar ways.

**A.  Applicable Law and Sentencing Framework: 18 U.S.C. § 3553 and USSG § 5K2.0**

The government submits that this case is outside the heartland conduct and supports an upward departure pursuant to U.S.S.G. § 5K2.0.  Under U.S.S.G. § 5K2.0, the Court has the authority to apply an upward departure at sentencing when the nature or extent of aggravating circumstances is not sufficiently taken into consideration by the Guidelines. Here, aggravating circumstances are present but not reflected in the Guidelines calculation. Namely, the fact that the defendant concealed his participation in politically motivated persecution is a significant aggravating circumstance that supports a substantial prison sentence.  He engaged in these acts of violence to ensure that the citizens of Les Irois fell in line with his authority and to suppress any opposition to his leadership.

A sentencing court is permitted to depart from the Guidelines if it finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." U.S.S.G. § 5K2.0(a)(1)(A) (emphasis added). More specifically, a sentencing court may depart based on (a) certain kinds of circumstances that are identified in the Guidelines and present in the case but that have not "adequately been taken into consideration in determining the

applicable guideline range," *Id.*; § 5K2.0(a)(2)(A), (b).  A departure may also be warranted when there are circumstances present in the offense "to a degree substantially in excess of . . . that which ordinarily is involved in that kind of offense," *Id.*; § 5K2.0(a)(3). Put simply, these provisions, whether applied individually or together, allow courts to depart upwards in "exceptional" or "atypical" cases outside the "heartland" of cases involving the conduct at issue. This is one such case.

Another one of the enumerated circumstances encompassed by § 5K2.0(a)(2)(A) that can support an upward departure arises when "the defendant committed the offense in order to . . . conceal the commission of another offense." U.S.S.G. § 5K2.9.  Here, the defendant did not merely commit a "technical" violation or conceal something minor in his past.  Rather, by failing to divulge his misconduct in Haiti, the defendant effectively escaped any accountability for his numerous and repeated violent crimes, at least up until the instant prosecution.  His concealment of these crimes allowed him to secure a green card, driver's license, and work authorization in the United States.  More importantly, it allowed him to find safe haven here and avoid any accountability in Haiti. The defendant's sentence should account for his criminal purpose in committing immigration fraud.

In addition, there are circumstances in this case that are present to a degree in excess of that which is ordinarily involved in human rights-related immigration fraud.  Because the defendant's crime entails exceptional circumstances "substantially in excess of . . . that which ordinarily is involved in [this] kind of offense," an upward departure is warranted. U.S.S.G. § 5K2.0(a)(3).  Defendant did not engage in these acts of violence because he was following orders from a superior or was part of an armed conflict.  He engaged in these acts of violence simply for his own personal benefit—to maintain his power and control over the citizens of Les

Irois, and to quell any opposition to his authority.  As such, this case falls well outside the heartland of regularly prosecuted immigration fraud matters, as other courts dealing with similar cases have recognized. Just as the defendant's egregious conduct exceeds the mine-run, so too should his sentence exceed the Guidelines range.

### B. Analysis

#### 1. Courts have imposed above-Guidelines sentences in similar human-rights related immigration fraud cases

In cases like this one, where the applicable Guidelines range does not adequately reflect the aggravating circumstances of the underlying crime, courts have imposed above-Guidelines sentences. *See, e.g.*, *United States v. Mitrovic,* No. 1:12-cr-00311 (N.D. Ga. Nov. 7, 2016), DE 271, *aff'd* 890 F.3d 1217 (11th Cir. 2018) (sentencing defendant to 57 months for lying during naturalization process to conceal abuses committed against prisoners as guard at Bosnian detention camp); *United States v. Lopes*, No. 1:07-cr-10437 (D. Mass. Feb. 20, 2009), DE 51 (sentencing defendant to 36 months for lying on asylum application to conceal former job as warden of prison in Cape Verde); *United States v. Boskic*, No. 1:04-cr-10298 (D. Mass. Nov. 20, 2006), DE 165, aff'd 545 F.3d 69 (1st Cir. 2008) (sentencing defendant to 63 months on visa fraud charge where he made false statements on his refugee application that concealed his military service in Bosnia); *United States v. Mrndzic*, No. 23-10158-DJC (defendant sentenced to 65 months on passport fraud charge where he made false statements on his refugee application in Bosnia).

Indeed, courts in this and other districts have regularly imposed either statutory maximum sentences or similarly long sentences on defendants who fraudulently entered this country by concealing their involvement in persecution or other serious human rights offenses. For instance, in *United States v. Beatrice Munyenyezi*, Criminal No. 10–cr–85–1–SM, (D.N.H.

2013), the Court imposed a sentence of 120 months incarceration on two counts of 18 U.S.C.

§1425 (fraudulent acquisition of naturalization).  Munyenyezi was a Hutu member of the ruling

National Revolutionary Movement for Development (known as the "MRND") at the time of the

Rwandan genocide, the wife of a notorious Interahamwe genocidaire, and was herself involved

in selecting Tutsis for rape and/or murder at a roadblock in Butare.  *Munyenyezi*, 781 F.3d at

542.  In upholding the ten-year sentence—which was the statutory maximum for a violation of

18 U.S.C. § 1425—the First Circuit acknowledged that the defendant was not sentenced for her

involvement in the Rwandan genocide but for the gravity of her lies on immigration forms:

> Despite what [the defendant] thinks, the judge kept his word, explicitly hitting her
> with the statutory maximum not as "punishment for genocidal conduct" but because
> her lies were the "most serious" infractions "of section 1425 that one can describe."
> She "is not accountable in this court" for her genocidal acts, the judge stressed. But
> "she is accountable for lying to obtain refuge and citizenship for which she was not
> qualified." And "lying about participation in genocide when specifically asked,"
> the judge explained, knowing full well "that such conduct is automatically
> disqualifying with respect to immigration and citizenship seriously undermines the
> integrity of this country's immigration standards in the most offensive way"
> imaginable. . . "We cannot abide this country being a haven for génocidaires," the
> judge emphasized. Citizenship applicants must know, he added, that if they "lie"
> about taking part in genocide, "the punishment for that fraud will not be lenient."
> By our lights, the judge's analysis is plausible and defensible.

*Id*. at 544-545.

The *Munyenyezi* sentence provides a critical guidepost for sentencing the defendant in

this matter.  While defendant did not participate in a large-scale genocide, his conviction reflects,

at a minimum, that he ordered and assisted in the murder of one individual, attempted murder of

two others, and other horrendous acts of violence against the citizens of Les Irois and his

political opponents. Significantly, in some of the cases in which a statutory maximum sentence

was imposed, the defendants were lower-level functionaries.  Here, under the defendant's direct

supervision, the Korega militia enforced the defendant's policies by various means, including by targeting political opponents in Les Irois through armed violence.

The *Munyenyezi* decision is just one of several in which courts have concluded that the statutory maximum, rather than the sentencing guidelines, is the appropriate benchmark for immigration fraud which concealed past persecution, war crimes, or genocide. The Third Circuit in *United States v. Jabateh*, 974 F.3d 281, 304 (3d Cir. 2020) affirmed a 360-month sentence comprised of four maximum sentences to be run consecutively. The defendant was convicted for lying about his involvement in human rights abuses, including murder, rape, and torture during his service as commander in Liberia's civil war. *Id.* While Jabateh's convictions were for perjury and naturalization fraud, the Third Circuit upheld the district court's conclusion that the defendant's "'criminal acts f[e]ll well outside the heartland of Guideline provisions related to immigration fraud and perjury' . . . that 'in lying to INS about his crimes and seeking sanctuary as a persecuted refugee, [Jabateh] stood the persecutor bar, and indeed, the asylum system itself, on its head' and 'perjury . . . undermines the foundations of our immigration and asylum system.'" *Id.* (quoting district court decision). It found the district's court decision to impose the statutory maximum "neither irrational nor novel." *Id.* Like Jabateh, defendant stood the immigration system "on its head" by first lying to immigration officials about his prior criminal conduct and then falsely testifying at his trial that he was a victim of persecution when he was in fact a perpetrator of persecution.

Similarly, in *United States v. Worku*, 800 F.3d 1195, 1208 (10th Cir. 2015), the Tenth Circuit upheld a 22-year sentence—the product of stacking three maximum penalties (two for naturalization fraud and one for aggravated identity theft). Worku had been a higher-level cadre member at a notorious prison in Ethiopia in the 1970s who participated in the torture of prisoners

at that prison because they were of a different ethnicity. *United States v. Worku*, No. 12-CR-

346-JLK, 2014 WL 2197537, at *5 (D. Colo. May 27, 2014). Witnesses testified at sentencing

that Worku had been involved in beatings and torture of prisoners, and one witness testified she

saw him kill three prisoners. *Id*. Worku, like defendant, lied his way into the United States after

he killed and maimed several persons in a distant country, effectively circumventing any justice

in his home country for years. In imposing three consecutive maximum penalties, the district

court observed,

> The statutes enacted by Congress provide maximum penalties of ten years
> imprisonment for two counts and a mandatory consecutive two-year sentence for
> the third. If not this case, what is the maximum sentence for? The interests of the
> United States in keeping its immigration processes free of corruption must be
> measured in terms of the degree of that corruption. Such, I think, is Congress's
> intent. . . . The Congress has provided maximum sentences for the most egregious
> violations of these statutes. If this case is not egregious, I cannot imagine what
> case would be.

*Id*. at *9; *see also Jordan*, 10-80069-CR, Tr. at *13 (S.D. Fl. Sept. 16, 2023) (sentencing

defendant to 120 months for naturalization fraud in part because "those involved in egregious

human rights violations abroad must be meaningfully deterred in their attempts to fraudulently

obtain United States citizenship. A sentence within the zero-to-six-month advisory guideline

range would be entirely insufficient.").

While not all courts have imposed the statutory maximum sentences in cases in which

persecution, torture, or war crimes have been concealed, many courts have imposed sentences at

the high end of the guideline range or above the guideline range. *See, e.g.*, *United States v.

Teganya,* 1:17-cr-10292-FDS (D. Mass July 1, 2019), *aff'd* 997 F.3d 424 (1st Cir. 2021)

(imposing high-end 97 month sentence on a defendant who concealed his involvement in the

Rwandan genocide); *United States v. Djurdic,* 4:17-cr-01658-JGZ-AMM (D. Ariz. Nov. 29,

2023) (imposing a sentence of 70 months for a defendant who concealed his role as a Serb prison

guard during the Bosnian War); *United States v. Boskic,* No. 1:04-cr-10298 (D. Mass. Nov. 20, 2006), *aff'd* 545 F.3d 69 (1st Cir. 2008) (granting an upward departure and sentencing defendant to 63 months on visa fraud charge where he made false statements on his refugee application that concealed his military service in Bosnia); *United States v. Mitrovic*, No. 1:12-cr-00311 (N.D. Ga. Nov. 7, 2016), *aff'd* 890 F.3d 1217 (11th Cir. 2018) (sentencing defendant to 57 months for lying during naturalization process to conceal abuses committed against prisoners as guard at Bosnian detention camp).

This Court, in *United States v. Teganya*, an immigration fraud case, imposed a high-end 97-month sentence.  As the Court well knows, Teganya was a Rwandan medical student at the university in Butare when the genocide broke out in 1994. *Teganya,* 1:17-cr-10292-FDS (D. Mass. July 1, 2019),  *aff'd* 997 F.3d 424 (1st Cir. 2021).  Trial testimony indicated that he was a member of the Rwandan MRND party and the Interahamwe youth wing of the MRND, and that he was involved in the rape and killing of several Tutsis during the genocide.  He was convicted on two counts of immigration fraud (18 U.S.C. §1546(a)) and three counts of perjury (18 U.S.C. §1621(2)) for lying about his membership in the MRND and Interahamwe and his participation in persecuting Tutsis during the genocide.  The Court found that Teganya's applicable guideline range was 78-97 months and sentenced him to the high end of that range. *Teganya*, 1:17-cr-10292-FDS at D.165.[6]

---

[6] It is notable that the Court in *Teganya* was reluctant to impose a sentence above the sentencing Guideline range because, "[v]irtually every atrocity that was described by witnesses in this trial was supported by the testimony of a single witness without much corroboration, and at least some of the witnesses had some credibility issues . . . my confidence level is not as high as it might be in . . . a murder trial in a modern American Court."  Sentencing Transcript at 27. By contrast, in this case, five witnesses testified consistently about the defendant's acts of violence and role as a leader. This evidence should provide the Court with a greater degree of

Similarly in *United States v. Boskic*, an earlier Bosnian war crimes case, Judge Woodlock upwardly departed from a Guideline range of 8-14 months to sentence the defendant to 63 months incarceration. *United States v. Boskic*, 1:04-cr-10298-DPW at D.165 pg. 9 *aff'd United States v. Boskic*, 545 F.3d 69 (1st Cir. 2008). Notably, the jury acquitted Boskic on the two most serious counts which charged him with lying about his involvement in persecution including the massacre of Muslims at Srebrenica. *Boskic,* 1:04-cr-10298-DPW at D.148. Instead, the jury convicted him for lying about serving in the army of Republika Srpska during the Bosnian war. Nonetheless, Judge Woodlock factored into Boskic's sentence his service in a military unit which committed a "genocidal massacre," by increasing Boskic's criminal history category from I to VI, and relying on the guideline for travel in foreign commerce to avoid prosecution. *Id*. at D.165 at pg. 9. E.

While there are differences in defendant's conduct in Les Irois, *Mrndzic's* conduct at Celebici and *Munyenyezi's* conduct at the roadblock in Butare, if it were possible to prosecute any of them in this country for their conduct overseas, they would likely all receive either a life sentence or decades of incarceration. *See Munyenyezi*, 781 F.3d at 544 (noting *Munyenyezi* would receive a life sentence if prosecuted for those crimes in the U.S.).

Another distinction warranting an above-Guidelines sentence in this case, as opposed to *Boskic* and *Mrndzic*, is that defendant was convicted of all three counts with which he was charged. *Boskic* was not convicted of two of the more serious charges and *Mrndzic* was not convicted of having been involved in the direct persecution of the victims. Here, given the verdict on all three counts, the jury clearly credited the testimony of the victims and witnesses

---

confidence about the defendant's culpability for the acts of violence alleged in the Indictment and the appropriateness of an above Guideline sentence.

about the defendant's participation in these brutal acts of violence and his subsequent lies about them on his visa application.  Accordingly, defendant should be given a sentence well above the Guidelines.

>    2.  **A Guideline range of 6-12, or even 70-87 months, does not account for the nature and extent of harm to victims.**

The Court should upwardly depart from the applicable Guideline range to account for the number of victims, and the nature and extent of their injuries.[7]  While the enhancement under USSG § 2L2.2(b)(4)(B) can serve as a guidepost, the government submits that there is more at stake. Consideration under that enhancement would generally account for "serious human rights offenses" such as torture and war crimes but would not distinguish those defendants who may have engaged in the violence against a single person over a short duration from those who engaged in, ordered, or assisted, the systematic, repeated violence against multiple persons over many years.  *See, e.g.*, USSG § 2B1.1(b)(2) (increase based on the number of victims); USSG §2B1.1(b)(1) (increase based on value of loss/economic harm); USSG §2L1.1(b)(2) (increase based on the number of unlawful aliens smuggled).

In addition, considerations raised by § 2L2.2(b)(4)(B) do not distinguish between those persons who caused limited physical harm through human rights-related violence and those persons who engaged in violence that resulted in permanent harm or death.  Other guidelines regularly increase the offense level depending on the severity of harm.  *See, e.g.*, USSG §2A1.5(c)(1) (death resulting increase); USSG §§2A2.1(b)(1), 2A2.2(b)(3), 2A2.3(b)(1), 2A4.1(b)(2) (severity of injury increases guideline).

---

[7] Here, the defendant and his supporters murdered Ecclesiaste Boniface and seriously maimed Juders Yseme, and Nissage Martyr.

Relatedly, departing solely under a consideration of USSG § 2L2.2(b)(4)(B) would not account for the re-traumatization of victims associated with a trial held decades after their initial trauma.  For many of the victims and witnesses of the defendant, coping with their experiences in Les Irois is a life-long endeavor.  Had justice been done decades ago, they might have been able to move beyond that trauma.  Instead, they have been reliving it.

### 3. A Guideline range of 6-12, or even 70-87 months, does not account for the duration of defendant's criminal concealment, and the benefits he has accrued through this decades-long crime.

Moreover, Courts have regularly departed upwards in cases in which defendants have engaged in numerous grave crimes and then concealed them when seeking refuge in the U.S. *See, e.g., Munyenyezi*, 781 F.3d at 544-45; *Jabateh,* 974 F.3d at 304; *Worku*, 800 F.3d at 1208; Sosa, 608 F. *App'x* at 468; Jordan, 432 F. *App'x* at 952.

Similarly, the Guidelines applicable to this matter do not account for the length of time defendant successfully concealed his prior crimes, and the benefits which he has accrued as a result of that long period.  First, defendant's successful decades long scheme to conceal his crimes in Les Irois has effectively terminated any realistic possibility that he will be brought to justice in Haiti.  As a result, the effectiveness of the defendant's flight from Haiti and concealment will most likely permit him to escape punishment for the crimes he committed in Les Irois.

Indeed, in 2012, despite the multiple investigations into defendant's criminal acts and various court proceedings in Haiti, defendant was appointed Interim Mayor by the then ruling party.  If returned to Haiti after a short sentence, it is likely the defendant will resume some position of power and seek revenge against those who testified against him.  A sufficiently long sentence is the primary way to keep him from seeking that revenge against those who testified against him and their families, as evidenced by the multiple protective orders against him issued

by Judge Burroughs in the civil case, and by the ongoing threats against victims and their families during the criminal trial.

Second, the length of his scheme has permitted him to build a life in the United States such that he stands before the Court as a defendant with no criminal history, and as a family man with a steady job. The defendant was only allowed to build this life by successfully concealing the violent crimes he committed in Les Irois. Like Enrico Ponzo, who built a respectable life in the western United States after engaging in organized crime in Boston, or James Bulger, who lived as a quiet retiree in Santa Monica, the defendant should not benefit from the fact that he lived a seemingly model life after committing crimes. *See United States v. Ponzo*, 853 F.3d 558, 567 (1st Cir. 2017); *United States v. Bulger*, 816 F.3d 137, 140 (1st Cir. 2016). Instead, the length of his concealment should not inure to his benefit; rather, it should be a basis for an upward departure.

### 4. A Guideline range of 6-12, or even 70-87 months, does not account for defendant's role in the offenses.

An upward departure is warranted in this case because the guideline range fails to account for defendant's role in the offenses in two material respects. First, neither the applicable guidelines, nor the considerations of § 2L2.2(b)(4)(B) distinguish between those individuals who committed a serious human rights offense alone (or at the direction of another), and those individuals, like defendant, who organized and led groups of individuals to engage in serious violent crime and human rights offenses at his direction. Thus, the applicable Guideline does not account for the fact that defendant was the leader and organizer of these acts of violence. Under his direct supervision, the Korega militia enforced the defendant's policies by various means, including by targeting political opponents through armed violence. By defendant's own admission at trial, and those of multiple other witnesses, he was the leader of the community and

backed by Korega.  Defendant was not merely following criminal orders - he gave the orders and directions to this armed group.  Indeed, he distributed the guns that were used in the radio station attack and gave the orders to kill Nissage Martyr and shoot Juders Yseme.  Individually or collectively, these facts warrant an upward departure from a guideline which does not account for them.

     **5.  A Guideline range of 6-12, or even 70-87 months, does not account for the multiple threats received prior to and during the civil and criminal trials in this case.**

     The Court will undoubtedly recall the various threats received by the witnesses and their families prior to and during the trial.  Prior to defendant's civil trial, Judge Burroughs issued four emergency protective orders for the victims and witnesses who had received threats warning them against testifying at defendant's trial.  The evidence of these threats at the criminal trial included text messages with threat that the witnesses and their families would be killed if they testified as well as images of rifles and shotguns and rocks that had been thrown at the home where the wife and young children of one witness were residing.

     These threats permeated the trial and caused the victims and witnesses a tremendous amount of fear particularly for their families who remained behind in Haiti.  Immediately prior to him being called to the witness stand to testify, one such witness began to sob uncontrollably outside the courtroom and reported that he had just learned the previous evening that his wife and young children in Haiti had been threatened should he testify.  The witness was understandably terrified for his family, refused to testify, and left the courthouse for the day.

Fortunately, the witness reluctantly agreed the next morning to testify and courageously took the stand.[8]

This years-long obstructive behavior by the defendant and his supporters almost succeeded and could have had a disastrous effect on the trial and administration of justice. Notwithstanding the threats, and because the victims and witnesses of defendant's cruelty had waited almost two decades for their day in court, they chose instead to courageously testify about the vicious acts of violence perpetrated by defendant and his armed group upon themselves, their family members, and the citizens of Les Irois. Surely, these additional acts of threatened violence should be taken into account to either upwardly depart or vary from the sentencing guideline range.[9]

### 6. A Guideline range of 6-12, or even 70-87 months, does not account for the defendant's abuse of power as Mayor.

The Guideline range does not take into effect that the defendant was not just an ordinary person who engaged in violent criminal acts. As mayor of Les Irois, defendant was entrusted with the well-being and safety of his community. Instead of protecting his community, he tried,

---

[8] During the trial, the Court questioned defendant's brother under oath about the ongoing threats. The Court subsequently stated that it found his denial of having been involved in the making of such threats not credible.

[9] During the trial, defendant made repeated accusations that the government's witnesses had threatened the defendant's witnesses. These accusations were utterly false but did not deter the defendant from presenting the Court with fabricated text messages and voice recordings which defendant alleged were the voices/texts of the government's witnesses. Incredibly, minutes before closing arguments, the defendant moved to reopen the case claiming to have yet another recording of a government witness admitting, contrary to his trial testimony, that he was a member of The 5,000 Men. After closing arguments and once the government had an opportunity to listen to the tape recording, it was obvious to the prosecution team that the voice on the recording was not that of the witness and was somebody in defendant's circle impersonating the witness in order to stir trouble. This obstructive conduct is egregious enough to warrant an upward departure/variance.

albeit unsuccessfully, to kill a human rights activist who was trying to mediate a dispute between the defendant and another citizen.  Instead of allowing the citizens of Les Irois to freely express themselves through the community radio station, he ordered a violent attack which resulted in the maiming of two other individuals.  Defendant utterly betrayed the trust of the citizens of Les Irois and used his coveted position of authority to engage in a year's long reign of terror that involved the commission of all sort of acts of violence, murder, and arson to anyone who opposed him.

### 7. Even if no single ground cited above warrants an upward departure/variance, collectively these grounds warrant a departure/variance.

Even if the Court were to conclude that each of the factors cited above, standing alone, does not warrant an upward departure/variance, when considered together an upward departure/variance is warranted. *See* USSG §5K2.0(c).

**i. Upward Departure.**  Like the defendants in *Munyenyezi, Jabateh, Worku*, and the other cases cited above, defendant presents a host of aggravating factors which justify a sentence above the calculated Guideline range.  Like those cases, an upward departure is the appropriate means of imposing a sentence which deters other criminals like defendant from fraudulently seeking safe haven in the United States to escape accountability for their crimes, and which provides the victims of defendant's crimes some sense of justice. That this case falls far outside the heartland of immigration fraud cases is evident. Accordingly, an upward departure from the Guidelines range is not just reasonable—it is necessary.

**ii. Variance.** Similarly, defendant's conduct warrants a variance based on the factors laid out in 18 U.S.C. § 3553(a).  First, the "nature and circumstances of the offense and the history and characteristics of the defendant" militate in favor of a significant upward variance. *See* 18 U.S.C. § 3553(a)(1). The defendant committed immigration fraud when he lied to immigration

officials about his significant history of violence which was material to their decision to issue a visa. A significant upward variance is needed to account for these circumstances and the defendant's abusive past and lies to hide it.

Second, the sentence should "reflect the seriousness" of his actions, "promote respect for the rule of law and provide just punishment." *See* 18 U.S.C. § 3553(a)(2)(A). The defendant's participation in the senseless murder of Ecclesiaste Boniface and attempted murders of Juders Yseme and Nissage Martyr alone demonstrates the seriousness of his culpable conduct, yet his crimes in covering up those abuses creates further harm that merits redress. The United States' immigration system relies on applicants' truthfulness in order to grant visas for entry to the United States. The defendant's misrepresentations about his past subverted this system and allowed a human rights violator to gain safe haven in the United States. His sentence should make clear that the United States takes this conduct very seriously.

The statutory maximum for immigration fraud is ten years, demonstrating that Congress believed certain cases of fraud are so serious they warrant a significant term of imprisonment. 18 U.S.C. § 1546. In addition, as noted above, the Sentencing Commission's enhancement for immigration fraud involving human rights abuses shows this kind of crime warrants a truly consequential sentence. Given the defendant's abuses and misrepresentations, the defendant deserves a lengthy sentence.

Third, an upward variance takes into account the "sentencing range established for the crime" as well as the "pertinent policy statement[s]" as outlined above. 18 U.S.C. §§ 3553(a)(4)-(5). Finally, an upward variance prevents unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6). Human rights violators receive multiple-year sentences, including the statutory

maximum, in immigration and naturalization fraud cases as evidenced in many of the cases previously cited in this memorandum.

IV.    **<u>CONCLUSION</u>**

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 120 months' incarceration, 36 months of supervised release, and a fine within the guideline range.  Such a sentence is appropriate because the defendant's lies about his many acts of violence in Haiti allowed him to obtain entry into the United States and permanent resident status for which he was not qualified—the most egregious type of immigration fraud. Defendant must be held accountable for such conduct which seriously undermines the integrity of this country's immigration standards in the most offensive way.

Respectfully submitted,

LEAH B. FOLEY
UNITED STATES ATTORNEY
District of Massachusetts

By:    <u>s/ Laura J. Kaplan</u>
Laura J. Kaplan
Assistant United States Attorney

Alexandra Skinnion
Trial Attorney
Human Rights and Special Prosecutions Section
Department of Justice, Criminal Division

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that these documents are being filed through the ECF system and therefore will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*s/ Laura J. Kaplan*
Laura J. Kaplan
Assistant U.S. Attorney

Date: June 13, 2025